**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| A. M., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Chicago Police Detectives James Cassidy, | ) |
| Star No. 20207; Edward Schmidt, | ) |
| Star No. 20253; Edward Winstead, Star ) | |
| No. 20119; James Redmond, Star No. 20248; | ) |
| Youth Officer L. Corey, Star No. 11442; | ) |
| and the CITY OF CHICAGO, | ) |
| | ) |
| Defendants. | ) |

Draft 1/9/03 p.m.

03C 0246

No.

Judge JUDGE ANDERSEN

MAGISTRATE JUDGE DENLOW

DOCKETED
JAN 1 3 2003

**COMPLAINT**

**JURISDICTION**

1. The jurisdiction of the Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983 et seq.; 28 U.S.C. §§ 1331 and 1343(3); and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

**PARTIES**

2. Plaintiff A.M. is a 19 year old African-American man, born on January 14, 1983, and is a resident of the city of Chicago.

3. Defendant Detectives James Cassidy, Edward Schmidt, Edward Winstead and James Redmond, and Defendant Youth Officer L. Corey were, at all times material to this complaint, City of Chicago police officers. Cassidy, Schmidt, Redmond and Winstead were assigned to Area 1 as Violent Crimes detectives; Corey, to Area 1 as a youth officer. Each is sued in his

1

individual capacity.

4. These defendants were, at all times material to this complaint, acting under color of state law and in the scope of their employment as Chicago Police officers.

5. Defendant City of Chicago is a municipal corporation, duly incorporated under the laws of the State of Illinois, is the employer and principal of the defendant police officers, and is responsible for the policies, practices and customs of its Police Department and Police Board.

**FACTS**

6. In October of 1993, A.M. was a ten year old African American fourth grade student, just over 5' tall and weighing just under 100 pounds, who lived with his mother and two brothers in an apartment on the 7200 block of South California in Chicago, a neighborhood comprised of African-American and white residents. He had never been arrested and had no experience in dealing with police.

7. On October 5, 1993, the body of Anna Gilvis, an 83 year old white woman, 5'6" or 5'7" tall who weighed 173 pounds, was discovered by her friend, in the bathroom of her apartment at 7219 S. California. Police who came to the scene determined that she had been severely beaten, her throat slit, her hands tied with telephone cord from the kitchen phone and her feet tied with red ribbon. Police also found her bedroom ransacked, her purse with the contents spilled out, and some valuable items missing. On the wall outside the bathroom, about five feet above the floor, police recovered an adult sized palm print. On the back porch, police recovered an adult sized foot print, and found that the back door had been jimmied. This information was contemporaneously recorded in police reports which became part of the official file in the case.

8. The day the body was found, the police conducted a canvas of the neighborhood, and

2

reported questioning 10 year old A.M. in his own back yard outside the presence, and without the permission, of A.M.'s mother.

9. Police also reported that A.M. told them that he saw a black male enter Gilvis' back yard and approach her property the previous evening, and that an hour later the man helped Gilvis carry groceries to the door of her residence.

10. Shortly after October 5, 1993, Area 1 detectives interrogated a number of adult suspects, including an adult neighbor of Gilvis', who was administered a polygraph examination, then released from custody.

11. Area One detectives interrogated and took both palm and shoe prints from various other adult suspects over the next few months.

12. During the October 1993 canvas of the neighborhood, police questioned A.M.'s mother, who provided her work address and telephone number. A.M.'s family later moved to a different address, but A.M.'s mother continued in the same employment. Between October 5, 1993 and September 1, 1994, no police ever contacted her at her employment about her son or the Gilvis investigation.

13. Between October 5, 1993 and September 1, 1994, A.M. completed fourth grade and began fifth grade.

14. On September 1, 1994, defendants Cassidy and Schmidt appeared at A.M.'s home to question the now eleven year old. Although these defendants knew that A.M.'s mother was at home, they interrogated A.M. in their car, outside of his mother's presence. Aware of A.M.'s prior statement, these defendants reported that they elicited from A.M. a different version of events during this interrogation. In this report the defendants asserted that A.M. said that he

3

witnessed two adult black males break into Anna Gilvis' back door.

15. The Defendants took A.M. to Area One Police headquarters, again without his mother, and defendants Cassidy and Schmidt reported that A.M. repeated what he had told Cassidy and Schmidt in their car. After approximately one and a half hours, defendants Cassidy and Schmidt took A.M. home.

16. On September 2, 1994, A.M.'s family was to celebrate A.M.'s younger brother's birthday party, and A.M. was looking forward to attending the party.

17. On September 2, 1994, at approximately 3:30 p.m., defendants Schmidt and Winstead picked up A.M. and brought him, alone, to Area One where defendants Cassidy and Schmidt again interrogated A.M., again outside of his mother's presence. The defendants lacked probable cause to believe that A.M. killed Anna Gilvis.

18. Defendants Cassidy and Schmidt failed to read A.M. his *Miranda* rights, prevented A.M.'s mother from being present, and failed to arrange for the presence of a youth officer or someone who would advocate for and protect A.M.'s rights.

19. Defendants Cassidy and Schmidt reported that they told A.M. that one of the black males had been arrested and brought to the station based on A.M.'s statement, and that he had denied A.M.'s version of the story and insisted on his innocence.

20. Defendants Cassidy and Schmidt further reported that without any questioning or prompting from them, A.M. spontaneously launched into an uninterrupted narrative, in which he purportedly stated that he witnessed the arrested adult male strike Gilvis with a baseball bat, drag her across the floor and stab her in the neck with a knife.

21. At this point during the interrogation, defendants Cassidy and Schmidt failed to read

4

A.M. his Miranda rights, call for his mother to be present or inform her that they were attempting

to elicit an inculpatory statement, or arrange for a youth officer or any other person to advocate

for and protect A.M.'s rights. Instead, they continued with the interrogation, telling A.M. they

did not believe his story, and providing A.M. with further details of the offense.

22. Defendants Cassidy and Schmidt would later report that, again without any

questioning or prompting on their part, A.M. then spontaneously altered his previous version of

events, this time purportedly describing himself to be the lookout for the adult male, and that he

later entered Gilvis' apartment and witnessed the adult male commit the crime in the same

manner as he had previously described it.

23. In spite of the fact that A.M.'s purported statements, as reported by Cassidy and

Schmidt, implicated him in the crime, defendants Cassidy and Schmidt failed to read A.M. his

*Miranda* rights, call for his mother to be present or inform her that A.M. had implicated himself,

or arrange for the presence of a youth officer or someone who would advocate for and protect

A.M.'s rights. Instead, they continued with the interrogation, telling A.M. they did not believe

his story, and providing A.M. with further details of the offense.

24. Defendants Cassidy and Schmidt, holding A.M. in a closed interrogation room, sat

within arm's reach of him, very close to A.M.'s face, making physical contact with his knee,

while stating that they would forgive him, as would God, if he would only confess to the Gilvis

murder. They further told A.M. that if he would confess, he could go home to his little brother's

birthday party.

25. During the interrogation, Defendant Cassidy also shouted and cursed at him and

forcefully slapped his own knees in a manner so as to threaten A.M.

5

26. Defendants Cassidy and Schmidt's interrogation techniques were highly coercive, abusive, and deeply frightened A.M., as they would any eleven year old child.

27. Defendants Cassidy and Schmidt would later report that, again, without any questioning or prompting on their part, A.M. spontaneously altered his previous version of events, burst out crying, shaking, chest heaving, saying, "I hated her and I killed her; she called me a nigger almost every day," and gave a version of events which purportedly set forth how he alone killed Anna Gilvis.

28. Again without procuring the presence of A.M.'s mother and without informing her that they had purportedly elicited an inculpatory statement, defendants Cassidy and Schmidt, in the presence of defendant youth officer Corey, who took absolutely no measures to protect A.M.'s constitutional rights, continued their coercive interrogation. According to Cassidy and Schmidt, A.M. then repeated the incriminating statement which he had given earlier, while adding some more details.

29. Only after this lengthy and highly coercive interrogation, and after he had purportedly given inculpatory statements did the defendants summon A.M.'s mother to Area One, where, in his mother's presence, A.M. denied killing Anna Gilvis.

30. Defendants Winstead and Cassidy later falsely claimed and testified that they heard A.M. tell his mother at Area One that he had killed Anna Gilvis despite the fact that they never included this purported admission in any of their police reports.

31. Through fabrication, coercion, and suggestion, the defendants constructed false admissions to the murder of Anna Gilvis which they attributed to A.M. Among their material fabrications were that A.M., his face filled with rage and hatred, said "I hated her and I killed her,

6

she called me a nigger almost every day," that he admitted to his mother that he killed Anna

Gilvis, and that A.M. said that Gilvis dragged herself across the floor.

32. The false admissions constructed by defendants Cassidy, Schmidt, Winstead and

Corey, acting jointly, and imposed on A.M. through fabrication, coercion, and suggestion, were

fundamentally inconsistent with the medical and physical evidence known to the defendants at

that time, including the adult palmprint, and adult footprint recovered at the scene, the nature of

the fatal wounds, the motive for the crime, the manner of entry, and the manner of restraint.

33. All the defendants also knew that this and other evidence established the physical and

psychological impossibility of this young child committing such a heinous and violent murder of

an adult nearly twice his size, and covering-up his involvement in such a crime from such

experienced detectives, as well as his family and friends, for nearly a year.

34. The fabricated, coerced and suggested admissions attributed to A.M. by the

defendants, alone, and/or when considered with the other evidence set forth above, did not

provide the defendants with probable cause to arrest, detain, imprison, charge, or prosecute A.M.

for the murder of Anna Gilvis.

35. Nevertheless Defendants Cassidy, Schmidt, Redmond and Winstead wrote false

official reports memorializing the admissions which they had constructed through suggestion,

fabrication and coercion, all with the intention of causing the arrest, detention, formal charging,

and prosecution of A.M. for the murder of Anna Gilvis.

36. Despite the knowing absence of probable cause, defendants Cassidy, Schmidt,

Winstead, Redmond, Corey, and other persons then met together and agreed and/or otherwise

participated in the decision to arrest and charge plaintiff with the murder of Anna Gilvis.

7

37. Defendants Cassidy, Schmidt, Winstead, Redmond and Corey, acting both individually and jointly, with themselves and others, directly and proximately caused the arrest, detention, formal charging and prosecution of A.M. for the murder of Anna Gilvis by the misconduct and unconstitutional acts alleged above.

38. As a direct result of the coercive interrogation, his false arrest, detention, and charging, A.M., who had never before been separated from his family, was taken from his mother's custody and incarcerated in a juvenile detention center.

39. On September 6, 1994, defendant Cassidy appeared at A.M.'s probable cause hearing in juvenile court. At this hearing defendant Cassidy presented through his testimony, which was materially false and perjurious and which was given pursuant to his joint action with his co-defendants, the fabricated, coerced and suggested admissions which he and his fellow defendants had constructed.

40. At this hearing defendant Cassidy, pursuant to his joint action with his fellow defendants, failed to advise the judge that the admissions which the defendants claimed to have obtained from A.M. in the killing of Anna Gilvis were false and unreliable and had been constructed by them through, fabrication, coercion, and suggestion. Additionally, defendant Cassidy, pursuant to his joint action with the other defendants, also failed to advise the judge that the evidence which the defendants had concocted was fundamentally inconsistent with the known objective evidence, including, but not limited to, the medical examiner's findings and opinion, and the physical evidence recovered at the scene.

41. Prior to, at the time of, and after the September 6, 1994, juvenile court hearing, defendant Cassidy and his fellow defendants also failed to advise the prosecutor that the evidence

8

used to arrest, charge, imprison and prosecute A.M. in the killing of Anna Gilvis was false, unreliable, was the product of fabrication, coercion, and suggestion, and was fundamentally inconsistent with other known evidence, and the manner and motive of the crime.

42. As a result of the false police reports created and concocted by defendants Cassidy, Redmond, Winstead, and Schmidt, the false admissions which were constructed by the defendants and presented by Cassidy at the hearing, and the other wrongful and unlawful acts of the named defendants set forth above and below, the juvenile court judge made a finding of probable cause.

43. As a direct result of the false police reports created and concocted by defendants Cassidy, Redmond, Winstead, and Schmidt, the false admissions which were constructed by the defendants and presented by Cassidy at the hearing, Cassidy's additional false testimony that A.M. could not be located for the year prior to his arrest, and the other wrongful and unlawful actions of Cassidy and Schmidt and the other defendants set forth above and below, the juvenile court judge made a finding of urgent and immediate necessity that A.M. be detained.

44. As a result of this finding of probable cause and urgent and immediate necessity corruptly and falsely obtained by the defendants, A.M.'s detention and imprisonment was continued.

45. At the pretrial court hearings on the case, which took place on September 7, 12, 15, and 19, 1994, defendants Cassidy, Schmidt and the other defendants again failed to inform the prosecutor or the juvenile court judge that Cassidy's testimony was false and perjurious, that they constructed the false admissions through fabrication, coercion and suggestion, and that the physical and medical evidence was fundamentally inconsistent with these false admissions. As a

direct result the judge again continued his detention.

46. At the October 5, 1994 trial, Defendants Cassidy and Winstead again presented the fabricated, coerced and suggested false admissions through their testimony, again failed to tell the prosecutor and the judge that this evidence had been so constructed by them, or that said false admissions were fundamentally inconsistent with the other evidence. As a direct result, the juvenile court judge adjudicated A.M. a delinquent, guilty of the murder of Anna Gilvis, and sentenced him to five years' probation in the custody of the Department of Children Family Services, causing him to be removed from the custody of his mother.

47. A.M. was required to sit through the probable cause and immediate and urgent necessity hearings and the trial, where he was repeatedly and falsely accused of being a hateful and violent murderer of an old lady, and where he was subsequently found to have committed the heinous murder of Anna Gilvis.

48. After defendants successfully obtained a wrongful conviction, defendant Cassidy publicly promoted through the media the false admissions to which Cassidy had previously testified but which had never previously been publicly reported, describing A.M. as a hateful child full of murderous rage who committed a heinous crime which children of his age were naively thought to be incapable of committing, thereby making A.M. a poster child for his personal campaign to treat young juveniles accused of crimes as adults and punish them more harshly.

49. At no time after Cassidy and Schmidt and the other defendants successfully obtained the wrongful conviction, did they inform any prosecutor, or any presiding judge or court that the prior testimony of Cassidy was false and perjurious, or that the admissions upon which the

10

conviction was based were false and constructed by them through fabrication, coercion and suggestion. As a result, A.M.'s conviction was affirmed on November 18, 1996.

50. Moreover, at the hearing on A.M.'s federal habeas corpus petition, Cassidy and Winstead again presented, through false and perjurious testimony, the false admissions which they had previously constructed through fabrication, coercion and suggestion. Nevertheless, on June 19, 2002, federal court judge Rebecca Pallmeyer granted A.M.'s petition for a writ of habeas corpus challenging his conviction.

51. The defendants have made no effort to identify the real killer of Anna Gilvis nor have they publicly exonerated A.M., thereby continuing and exacerbating his ongoing pain, suffering, and injury as a result of his false and wrongful arrest, detention, accusation, imprisonment, prosecution and conviction.

52. The police department has conducted no investigation of the defendants' conduct with respect to A.M. and the Gilvis investigation, and no defendant or other police employee has been disciplined for their actions as described above.

53. Defendants Cassidy, Schmidt, Winstead, Redmond and Corey, acting jointly and with other police, investigative, supervisory, and command personnel, together and under color of law, reached an understanding, engaged in a course of conduct, engaged in a joint action and otherwise conspired among and between themselves to deprive plaintiff of his constitutional rights, and did deprive plaintiff of said rights, including his right to be free from unreasonable arrest and seizure, from wrongful confinement, imprisonment; and his rights to be free from involuntary incrimination and access to the Courts and to a fair and impartial trial, as protected by the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

11

Because said actions were done with the knowledge and purpose of depriving plaintiff, who is African-American, of the equal protection of the laws and/or of equal privileges and immunities under the law, and with racial animus toward the plaintiff, they also deprived plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. §§ 1983 and 1985.

54. In furtherance of this conspiracy or conspiracies, defendants Cassidy, Schmidt, Winstead, Redmond and Corey, together with their co-conspirators, committed the overt acts set forth above, including, but not limited to, the wrongful arrest, imprisonment, charging and prosecution of plaintiff; the fabrication, coercion and suggestion of knowingly false inculpatory evidence against plaintiff; the unconstitutional coercion of plaintiff in an attempt to compel him to make false inculpatory statements against himself; the repeated deception of prosecutors and judges, by, *inter alia*, making knowing misstatements and the presentation of this knowingly false and incomplete evidence to prosecutors and judges; the interrogation of plaintiff outside the presence of his mother, youth officer, or someone who would advocate for and protect his rights; the making of false and defamatory public statements concerning A.M.; the giving of false testimony; and the filing of false and incomplete statements and reports; and the failure to come forward with a truthful account of the events.

55. Said conspiracy or conspiracies, joint actions and overt acts continue to this date, as defendants have yet to publicly exonerate A.M. and clear his name, have caused and continue to cause plaintiff's constitutional rights to be violated and the injuries, pain, suffering, fear, mental anguish, detention, imprisonment, humiliation, defamation of character and reputation, and loss of freedom and companionship, as set forth more fully above and below.

56. As a direct result of the above conduct of the defendants, plaintiff was robbed of his childhood, as well as his ability to grow up in his own home with his mother and brothers; he experienced, and continues to experience, psychological and behavioral problems, as he was and is stigmatized as a child capable of a horrendous murder; he has suffered and continues to suffer, severe, acute and chronic symptoms including severe anxiety and trauma, social isolation, depression, suicidal ideation, anger, irritability, inattentiveness, self-hatred, exacerbation of pre-existing conditions, and loss of freedom.

57. As a direct result of the above described conduct of defendants, plaintiff suffered and continues to suffer pain, injury and suffering, mental distress, anguish and humiliation, loss of freedom, and incurred expenses, including, but not limited to, those set forth above.

### COUNT I
### (42 U.S.C. § 1983 Claim for False Arrest and Imprisonment)

58. Plaintiff realleges paragraphs 1 through 57.

59. The actions of defendants Cassidy, Schmidt, Winstead, Redmond and Corey, individually, jointly, and in conspiracy, in falsely arresting, detaining and imprisoning plaintiff A.M. for the murder of Anna Gilvis without probable cause, violated his Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

60. The actions of the defendants in falsely arresting A.M. and covering up their own misconduct were the direct and proximate cause of plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, plaintiff A.M. demands judgment against defendants Cassidy, Schmidt,

Winstead, Redmond and Corey for substantial compensatory damages, and, because these defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II

### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

61. Plaintiff realleges paragraphs 1 through 60.

62. The actions of defendants Cassidy, Schmidt, Winstead, Redmond and Corey, individually, jointly, and in conspiracy, in coercively and without probable cause interrogating plaintiff A.M., resulting in false admissions to the murder of Anna Gilvis, violated his Fifth and Fourteenth Amendment right to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

63. The actions of the defendants in coercively interrogating A.M. were the direct and proximate cause of plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, plaintiff A.M. demands judgment against defendants Cassidy, Schmidt, Winstead, Redmond, and Corey for substantial compensatory damages, and, because these defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

14

## COUNT III
**(42 U.S.C. 1983 Claim for Deprivation of Right to Fair Trial and for Wrongful Conviction)**

64. Plaintiff realleges paragraphs 1 through 63.

65. Defendants Cassidy, Schmidt, Winstead, Redmond, and Corey, individually, jointly, and in conspiracy, maliciously and without probable cause caused the wrongful charging, prosecution, and conviction of A.M. for the murder of Anna Gilvis by fabricating, coercing, and/or suggesting the false admissions which formed the basis for Plaintiff's said charging, prosecution and conviction, by withholding from the prosecutors, judges and defense attorneys involved in A.M.'s prosecution the fact that these admissions were false, fabricated, coerced and suggested, by writing false reports and giving false testimony, and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

66. The actions of defendants Cassidy, Schmidt, Winstead, Redmond and Corey, in depriving plaintiff of his right to a fair trial and not to be wrongfully convicted were the direct and proximate cause of the injuries to plaintiff which are set forth above.

WHEREFORE, plaintiff A.M. demands judgment against defendants Cassidy, Schmidt, Winstead, Redmond, and Corey for substantial compensatory damages, and, because these defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for plaintiff A.M.'s constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT IV
### (42 U.S.C. § 1983 *Monell* Policy Claim)

67. Plaintiff realleges paragraphs 1 through 66.

68. The actions of defendants Cassidy, Schmidt, Winstead, Redmond and Corey, as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the City of Chicago, its police department, its Police Board, its O.P.S. and I.A.D., its Personnel Division, and/or its Superintendents.

69. At all times material to this complaint, the defendant City and its police department, Superintendents, O.P.S., I.A.D., Personnel Division, Detective Division, and/or Police Board had interrelated *de facto* policies, practices, and customs which included, *inter alia*, a) conducting physically, psychologically or otherwise illegally or improperly coercive interrogations of witnesses, suspects and arrestees including, but not limited to, persons who are juveniles and/or have mental disabilities, in order to obtain confessions and wrongful convictions, and then filing false reports and giving false testimony about said interrogations; b) while questioning or interrogating juveniles and the mentally disabled, of barring or otherwise failing to provide for the presence of a parent, guardian, or another person who would advocate for and protect the rights of those persons being questioned; c) the failure to videotape the interrogation or questioning of suspects, arrestees, and witnesses, particularly when they are juveniles or mentally disabled; d) the failure to properly train, supervise, discipline, transfer, monitor, counsel and otherwise control police officers, particularly those who are repeatedly accused of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false

16

reports and statements; of physically, psychologically or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects and arrestees including, but not limited to, persons who are juveniles and/or have mental disabilities; of intimidation of witnesses; and of other police misconduct and abuse; e) the police code of silence, particularly in cases where officers engaged in the above articulated violations, whereby police officers refuse to report instances of police misconduct, including unconstitutional and coercive interrogations, fabrication and planting of evidence of which they are aware, despite their obligation under police regulations to do so; said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges, and to perjure themselves in criminal cases where they and their fellow officers have coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant.

70. The aforementioned policies, practices and/or customs set forth above, separately and together, proximately caused injury to the plaintiff in this case, *inter alia*, because defendants had good reason to believe that their misconduct would not be revealed or reported by fellow officers or their supervisors, that their denials would go unchallenged by these supervisors and fellow officers, from the police Superintendents, Police Board, and Directors of O.P.S. on down, and that they were effectively immune from disciplinary action, thereby protecting them from the consequences of their unconstitutional conduct.

71. Additionally, Defendants Cassidy and Winstead, and, on information and belief,

17

Schmidt and Redmond, have been the subject of multiple meritorious allegations of constitutional violations, including coercing statements from juveniles and the disabled, fabrication of evidence, intimidation of witnesses, initiating and continuing malicious prosecutions, and making false reports and statements, including, but not limited to, the Mary Braggs and Ryan Harris cases.

72. In all of the allegations of misconduct against defendant Cassidy, the allegations against him were not properly investigated by the CPD, nor was he disciplined, or otherwise supervised, monitored or controlled for his misconduct.

73. Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, encouraged, *inter alia*, the coercing of statements from suspects, witnesses and arrestees, particularly juveniles and the disabled, the fabrication of evidence, the intimidation of witnesses, and the making of false statements and reports, and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by defendants Cassidy, Schmidt, Winstead, Redmond, and Corey, in this case, and the injuries sustained by plaintiff A.M.

74. Additionally, said failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel defendants Cassidy, Schmidt, Winstead, Redmond, and Corey was also done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to plaintiff.

WHEREFORE, plaintiff A.M. demands judgment against defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this court finds equitable and just.

## COUNT V
### (745 ILCS 10/9-102 Claim Against the City)

75. Plaintiff realleges paragraphs 1 through 74.

76. Defendant City of Chicago was the employer of defendant police officers Cassidy, Schmidt, Winstead, Redmond and Corey at all times relevant to this complaint.

77. These defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

WHEREFORE, plaintiff A.M., pursuant to 745 ILCS 10/9-102, demands judgment against the defendant City of Chicago in the amounts awarded to plaintiff against the individual defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

Dated: January 13, 2003                    Respectfully submitted,

G. Flint Taylor
Janine L. Hoft
Jan Susler
People's Law Office

1180 N. Milwaukee
Chicago, IL 60622
773/235-0070
Attorneys for Plaintiffs


**Plaintiff demands trial by jury on all counts.**

19

#2

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

FILED-EDS

**DEFENDANTS** Chicago Police Detectives James Cassidy,
Star No. 20207; Edward Schmidt, Star No. 20253;
Edward Winstead, Star No. 20119; James Redmond, Star No.
20248;Youth Officer L. Corey, Star No.11442; and the City
of Chicago,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Cook
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Cook
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

DOCKETED
JAN 1 3 2003

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60622    (773) 235-0070

ATTORNEYS (IF KNOWN)

# 03C 0246

JUDGE ANDERSEN

MAGISTRATE JUDGE DENLOW

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 362 Personal Injury — | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |     Liability   ☐ 365 Personal Injury | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment |     Slander   ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers     Injury Product Liability | ☐ 650 Airline Regs | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted |     Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine    **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product   ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment |     Liability   ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle     Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract |     Product Liability   ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury     Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting   ☐ 510 Motion to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment     Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/     Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to Justice |
| ☐ 240 Torts to Land |     Accommodations   ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare   ☐ 535 Death Penalty | | ☐ 871 IRS — Third Party | State Statutes |
| ☐ 290 All Other Real Property | ☒ 440 Other Civil Rights   ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc | 26 USC 7609 | ☐ 890 Other Statutory Actions |
| |   ☐ 550 Civil Rights | Security Act | | |
| |   ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

The jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C. 1983 et seq.; 28 U.S.C. 1331
1343 (3); the constitution of the United States and supplementary jurisdiction.

## VII. REQUESTED IN COMPLAINT

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☒ YES   ☐ NO

## VIII. This case

☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE    1-13-03

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

A.M.,
    Plaintiff

**In the Matter of**
Chicago Police Detectives James Cassidy,
Star No. 20207; Edward Schmidt, Star No. 20253;
Edward Winstead, Star No. 20119; James Redmond,
20248; Youth Officer, L. Corey, Star No. 11442; and
the City of Chicago,
    Defendant

**Case Number:**  

03C 0246
JUDGE ANDERSEN

JAN 1 3 2003

CLERK
U.S. DISTRICT COURT
03 JAN 13 PM 2: 26
FILED-EDS DOCKETED

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff

MAGISTRATE JUDGE DENLOW

| (A) | (B) |
|---|---|
| **SIGNATURE** | **SIGNATURE** |
| **NAME** G. Flint Taylor | **NAME** Janine Hoft |
| **FIRM** People's Law Office | **FIRM** same as (A) |
| **STREET ADDRESS** 1180 N. Milwaukee Ave. | **STREET ADDRESS** |
| **CITY/STATE/ZIP** Chicago, IL 60622 | **CITY/STATE/ZIP** |
| **TELEPHONE NUMBER** (773) 235-0070 | **TELEPHONE NUMBER** |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 2802058 | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** |
| **MEMBER OF TRIAL BAR?** YES ☒ NO ☐ | **MEMBER OF TRIAL BAR?** YES ☒ NO ☐ |
| **TRIAL ATTORNEY?** YES ☒ NO ☐ | **TRIAL ATTORNEY?** YES ☒ NO ☐ |
| | **DESIGNATED AS LOCAL COUNSEL?** YES ☒ NO ☐ |

| (C) | (D) |
|---|---|
| **SIGNATURE** | **SIGNATURE** |
| **NAME** Jan Susler | **NAME** |
| **FIRM** Same as (A) | **FIRM** |
| **STREET ADDRESS** | **STREET ADDRESS** |
| **CITY/STATE/ZIP** | **CITY/STATE/ZIP** |
| **TELEPHONE NUMBER** | **TELEPHONE NUMBER** |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** |
| **MEMBER OF TRIAL BAR?** YES ☒ NO ☐ | **MEMBER OF TRIAL BAR?** YES ☐ NO ☐ |
| **TRIAL ATTORNEY?** YES ☒ NO ☐ | **TRIAL ATTORNEY?** YES ☐ NO ☐ |
| **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☒ | **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ |

**PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.**

13